Western Supply and Furnace Company, a corporation, et al. [1] v. Commissioner. Western Supply & Furnace Co. v. Commissioner
Docket Nos. 57117, 57142-57144.
United States Tax Court
T.C. Memo 1959-57; 1959 Tax Ct. Memo LEXIS 132; 18 T.C.M. (CCH) 288; T.C.M. (RIA) 59057; May 30, 1959
*133 Joseph M. Solon, Esq., for the petitioners. Warren C. Seieroe, Esq., and Robert W. Schafer, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in income taxes, declared value excess profits taxes, and excess profits taxes, and also additions to tax, as follows: Western Supply and Furnace Company
Docket No. 57117
Income Tax
Additions to Tax
Year
Deficiency
Sec. 293(b)
Sec. 291(a)
1940
$ 1,271.88
$ 635.94 $
1941
3,502.20
1,751.10
1942
3,576.03
1,788.02
1943
2,358.38
1,179.19
1944
3,077.98
1,538.99
1945
2,444.90
1,222.45
1946
47,896.82
23,948.41
Declared Value Excess Profits Tax
1940
$ 564.56
$ 282.28 $
1941
2,775.16
1,387.58
1942
5,150.47
2,575.24
1943
6,792.81
3,396.41
1944
10,331.38
5,165.69
1945
13,796.31
6,898.16
Excess Profits Tax
1940
$ 350.61
$ 175.31
$ 87.65
1941
6,415.12
3,207.56
1,603.78
1942
23,643.49
11,821.75
5,910.88
1943
37,569.31
18,784.65
9,392.33
1944
50,854.81
25,427.42
12,713.71
1945
69,553.72
34,776.86
17,388.43
Respondent, in an amended *134 answer, claimed additional deficiencies for the years 1944 and 1945 in Docket No. 57117 in the sums of $85.94 and $12.07, and additions to tax under section 291(a) of the Internal Revenue Code of 1939 for the years 1942 to 1946, inclusive, as follows: Additions to Tax
Claimed in Amended
Year
Answer ( § 291(a))
1942
$ 1,028.90
1943
760.93
1944
1,173.24
1945
$ 1,692.10
1946
13,610.21
These claimed additions to deficiencies in income tax were accompanied by additional claims for deficiencies in declared value excess profits tax for the years 1943 and 1944 in the sums of $23.62 and $368.85, and additions to tax under section 291(a) of the Internal Revenue Code of 1939 for the years 1942 through 1945, as follows: Additions to Tax
Claimed in Amended
Year
Answer ( § 291(a))
1942
$1,287.62
1943
1,704.11
1944
2,675.06
1945
3,368.54
The amended answer also claimed additional deficiencies in excess profits tax for the years 1943 and 1944 in the sums of $139.75 and $1,801.68. The amended answer also claimed increased additions to tax for said years under section 293(b) of the Internal Revenue Code *135 of 1939 in the sums of $69.88 and $900.83, respectively. Josephine S. Bahcall - Docket No. 57142
Income Tax (including Victory Tax for 1943)
Additions to Tax
Year
Deficiency
Sec. 293(b)
1941
$ 37.89
$ 18.95
1942
96.30
48.15
1943
215.40
107.70
1944
712.18
356.09
1945
19,507.50
9,753.75
1946
10,376.19
5,188.10
Louis S. Bahcall - Docket No. 57143
Income Tax (including Victory Tax for 1943)
1941
$ 177.86
$ 88.93
1942
96.30
48.15
1943
96.31
48.16
1944
93.00
46.50
1945
278.00
139.00
1946
519.67
259.84
In an amended answer, respondent claimed additional deficiencies in Docket No. 57142 for the years 1943 and 1944 in the amount of $123.74 and $2,833.51 and corresponding increases in additions to tax under section 293(b) of the Internal Revenue Code of 1939. In an amended answer, respondent claimed additional deficiencies in Docket No. 57143 for the years 1943 and 1944 in the amounts of $1.11 $21and and corresponding increases in additions to tax under section 293(b) of the Internal Revenue Code of 1939. Louis S. Bahcall and Josephine S. Bahcall,
his wife, Docket No. 57144
Income Tax
Addition to Tax
Year
Deficiency
Sec. 293(b)
1940
$958.51
$479.26
*136 Respondent made several concessions on brief and effect will be given to these in the Rule 50 computation. The issues which are now for decision in these consolidated cases are: 1. Whether Western Supply and Furnace Company understated its net income for the years 1943, 1944, 1945 and 1946 through the use of incorrect inventories; 2. Whether Western Supply and Furnace Company understated its gross receipts during each of the years 1940 through 1946; 3. Whether Western Supply and Furnace Company, in 1940, 1944, 1945 and 1946 improperly claimed deductions for certain expenditures made for building additions and improvements; 4. Whether Western Supply and Furnace Company understated gains realized from the sale of certain capital assets in the years 1942, 1945 and 1946; 5. Whether any portion of the deficiencies determined by the respondent against Western Supply and Furnace Company for the years 1940 through 1946 was due to fraud with intent to evade tax within the meaning of section 293(b) of the Internal Revenue Code of 1939; [2]
6. Whether Western Supply and Furnace Company is liable for additions to tax under section 291(a) for failure to file returns *137 for the years 1940 through 1946; 7. Whether Louis S. Bahcall and Josephine S. Bahcall derived taxable income from the rent-free occupancy during the years 1942 through 1946 of residences owned by Western Supply and Furnace Company, a corporation controlled by them; 8. Whether Louis S. Bahcall and Josephine S. Bahcall received constructive dividends from Western Supply and Furnace Company in the years 1940, 1943, 1944, 1945 and 1946; 9. Whether, if it is found that Louis S. Bahcall owned certain assets prior to the years here involved, the amounts of unreported income in the years 1941 through 1946 should be attributed to him instead of to Western; 10. Whether a portion of the deficiency determined by respondent against petitioners Louis S. Bahcall and Josephine S. Bahcall for the year 1940 was due to fraud with intent to evade tax; 11. Whether a portion of the deficiencies determined by the respondent against Louis S. Bahcall for the years 1941 through 1946 was due to fraud with intent to evade tax; 12. Whether a portion of the deficiencies determined by the respondent against Josephine S. Bahcall for the years 1942 through 1946 was due to fraud with intent to evade tax; *138 and 13. Whether any of the years here involved are barred by the statute of limitations. Findings of Fact Some of the facts have been stipulated and they are hereby incorporated by this reference. Western Supply and Furnace Company, hereinafter sometimes called Western, is an Illinois corporation with its principal place of business in Maywood, Illinois. During the years 1940 through 1946 the officers and stockholders of Western were as follows: Title
Shares
Louis S. Bahcall
Treasurer
1
Josephine S. Bahcall
President
98
Dora Schwartz
Vice President
1
Western filed corporation income and declared value excess profits tax returns for the years 1940 and 1941 with the then collector of internal revenue for the first district of Illinois, at Chicago, Illinois. The return for each of the years was signed by J. S. Bahcall and L. S. Bahcall, president and treasurer, respectively. Western filed purported corporation and declared value excess profits tax returns for each of the years 1942 through 1945 and a purported corporation income *139 tax return for the year 1946 with the then collector of internal revenue for the first district of Illinois. The purported returns for 1942, 1943, 1944, 1945 and 1946 were each signed by only one corporate officer, those for 1942 through 1945 being signed by J. S. Bahcall, president, while the purported return for 1946 was signed by L. S. Bahcall, treasurer. Western did not file excess profits tax returns for any of the years 1940 through 1945. Louis S. Bahcall and Josephine S. Bahcall, husband and wife, are residents of Maywood, Illinois. They filed a joint Federal income tax return for the year 1940 with the then collector of internal revenue for the first district of Illinois. For the years 1941 through 1946 both Louis and Josephine filed individual Federal income tax returns with the then collector of internal revenue for the first district of Illinois. Western executed a series of consent agreements pursuant to section 276(b) extending to June 30, 1955 the time within which the respondent might assess additional income tax and declared value excess profits tax for the year 1945. Josephine S. Bahcall and Louis S. Bahcall each executed a series of consent agreements extending *140 to June 30, 1955 the time within which the respondent might assess additional income taxes for the years 1944, 1945 and 1946. During the years 1940 through 1946 Western was engaged in the business of selling, installing, cleaning and repairing furnaces and heating equipment, hereinafter sometimes referred to as the shop business. Some time in 1941 Western also became engaged in the business of selling hardware at retail by establishing a small hardware department in the same building where the shop operations were conducted. The hardware operation was small in 1941. On December 31, 1946, Western, in addition to its shop business, operated four retail hardware stores. Western followed a fixed procedure during the years 1940 through 1946 with respect to its shop business. Orders for furnace cleaning and repairing were received by telephone, usually by Josephine S. Bahcall, and by soliciting salesmen. At the time the order was received Josephine S. Bahcall prepared a hard card from which clerks prepared an invoice in triplicate showing the customer's name and address, the date, the nature of the work ordered and the charge for such work (for instance, vacuum cleaning of a furnace *141 - $7.50). These hard cards were ordinarily kept seven or eight years. The original (white) was retained in the office and the yellow and pink copies were given to the repair crews who performed the work. If the customer paid the workmen, they (the workmen) receipted the pink copy of the invoice and left it with the customer and turned the yellow copy, together with the payment, over to Josephine S. Bahcall. Josephine S. Bahcall receipted the yellow copy and mailed it back to the customer and receipted the original and turned it over to the bookkeeper for posting. In instances where the workmen performed additional work, the necessity for which was first discovered on the job and therefore not shown on the original invoice, they would itemize charges for any parts used and additional labor on the yellow and pink copies and indicate thereon the total charge. In some instances the payments received for additional parts and labor were not noted on the original (white) invoice and consequently not recorded as receipts on the books of Western Supply and Furnace Company. On December 21, 1939 a building permit was issued to Louis S. Bahcall and in 1940 a building 45 feet wide, 50 feet deep *142 and 20 feet high, or 45,000 cubic feet, with no basement, was constructed at 1014 St. Charles Road, Maywood, Illinois, on property owned by petitioners Louis S. Bahcall and Josephine S. Bahcall as joint tenants. Construction was a cement slab first floor, cement block walls, rough second-hand lumber for joists, roof boards and floor boards, walls and ceiling not lathed or plastered, steam heat, face brick front with display windows, first floor walls lined with shelves and ceiling of celotex squares. The costs of construction were claimed by Western as deductible expenditures in that year. The cost of constructing this building was $.17 per cubic foot. In 1944 an addition was constructed to the existing buildings on premises owned by Western at 1010-1020 St. Charles Road, Maywood, Illinois. The addition consisted of a building 45 feet wide, 68.67 feet deep and 20 feet high, or 61,803 cubic feet, and its construction was similar to that of the building constructed in 1940, and the cost of construction was $.17 per cubic foot. A large part of the cost of materials used for the construction was reflected in the corporate books and on the purported return filed by Western for 1944 as *143 miscellaneous cash purchases and shop expenses, and these amounts were included in cost of goods sold and shop expense for 1944. In 1945 Western made improvements of a capital nature to premises owned by it located at 601 North 1st Avenue, Maywood, Illinois. The cost of such capital improvements was $5,334.36, which amount was included in "other deductions" of $38,682.08 claimed as a deduction by Western in its purported return filed for the year 1945. In 1946 an addition was constructed by Western to the existing buildings owned by it at 1010 St. Charles Road, Maywood, Illinois. This addition consisted of a ground floor building 55 feet wide, 95 feet deep and 23 feet high, and second floor construction 55 feet wide, 132 feet deep, and 23 feet high. Its construction was similar to that of the building constructed in 1940, except that the building was not heated and the cost of constructing this building was $.17 per cubic foot. In the same year the following additions and improvements were made on premises owned by Western at 601 North 1st Avenue, Maywood, Illinois: (1) construction of chicken house 22 feet long, 22 feet wide and 10 feet high; (2) construction of a garage 28 feet *144 wide, 58 feet long and 14 feet high; (3) construction of a garage 28 feet wide, 24 feet long and 10 feet high; (4) construction of 400 feet of flagstone walks; (5) construction of concrete walks 150 feet long and 3 feet wide; (6) construction of concrete apron 90 feet long and 2 feet wide; (7) construction of concrete patio and steps 15 feet by 15 feet; (8) installation of 335 feet of copper gutters and downspouts; and (9) crushed stone driveway using 60 cubic yards of crushed stone. The cost of constructing these additions and improvements was $1,000, $5,000, $1,500, $1,200, $135, $54, $250, $200 and $180, respectively. A large part of the costs of materials used for construction was reflected in Western's books and on its purported return for 1946 as miscellaneous cash purchases and shop expenses and these amounts were included in cost of goods sold and shop expense for 1946. Also in 1946 Western made improvements of a capital nature to premises owned by it at 601 North 1st Avenue, Maywood, Illinois, and 601 South 10th Avenue, Maywood, Illinois, at respective costs of $1,690.80 and $578. These amounts were included in "other deductions" of $55,917.58 claimed by Western on its purported *145 return filed for 1946. The total capital expenditures improperly charged to ordinary expenses in 1946 was $26,051. In 1942 Western realized a net long-term capital gain from the sale of real estate in the amount of $5,856.54; in 1945 Western realized a net long-term capital gain of $6,551.99 and a net short-term capital gain in the amount of $698.79 from the sale of real estate; and during the year 1946 Western realized a net long-term capital gain of $4,074.87 and a net short-term capital gain in the amount of $4,682.37 from the sale of real estate. The accounting records maintained by Western included ledger accounts for its officers, Louis S. Bahcall and Josephine S. Bahcall. The ledger account designated "L. S. Bahcall, Personal" was opened by a general journal entry dated January 1, 1941 with a credit of $1,328.83. As of December 31 of the years 1941 through 1946 it showed the following: Year Ending
Credit
Dec. 31
Balance
1941
$ 6,466.31
1942
10,075.34
1943
25,942.89
1944
47,893.17
1945
50,629.50
1946
49,691.40 The ledger account designated "J. S. Bahcall, Personal" was opened by a general journal entry dated January 1, 1941 with a credit *146 of $1,328.84. As of December 31 of the years 1941 through 1946, it showed the following: Year Ending
Credit
Dec. 31
Balance
1941
$15,195.02
1942
54,599.37
1943
81,172.89
1944
88,678.33
1945
71,436.08
1946
69,004.76
During the years involved the following amounts were deducted by Western as officers' salaries and reported on their returns by Josephine and Louis Bahcall: Josephine S.
Louis S.
Year
Bahcall
Bahcall
1940
$3,000
$3,000
1941
4,000
4,000
1942
4,000
4,000
1943
3,000
3,000
1944
3,000
3,000
1945
3,700
3,700
1946
6,050
6,050 During these same years the following amounts of salary were credited to the officers' personal accounts on Western's books: Salary Credited
Salary Credited
to Josephine S.
to Louis S.
Bahcall Per-
Bahcall Per-
Year
sonal Acct.
sonal Acct.
1940
$ None
$ None
1941
3,965.00
3,965.00
1942
3,983.35
3,983.35
1943
2,400.10
2,782.80
1944
2,346.00
2,720.40
1945
1,636.00
1,772.80
1946
None
None
During 1940 and 1941 Louis S. Bahcall and Josephine S. Bahcall made payments on various real estate purchase *147 contracts in the amounts of $2,006.74 and $7,915.20, respectively. In 1941 and 1942 they paid real estate taxes in the amounts of $277.16 and $117.30, respectively. In 1943 and 1944 Josephine S. Bahcall made deposits in a savings account in the amounts of $500 and $8,310, respectively, and in the years 1945 and 1946 Louis S. Bahcall and Josephine S. Bahcall made deposits aggregating $9,901.77 and $7,649.77, in the respective years, to a joint checking account. In the year 1947 the books and records of Western showed various individual accounts receivable with credit balances which had existed for as long as five years. The credit entries creating such balances aggregated $165.89 in 1941, $379.38 in 1942, $1,030.05 in 1943, $982.61 in 1944, $1,211.53 in 1945 and $1,517.70 in 1946. In the years 1943 through 1946 Western received rental income from property owned by it in the amounts of $712.14, $304, $1,045.50 and $546.50, respectively, which amounts were not shown on Western's books and records nor reported by it in its purported returns for those years. In the years 1942 through 1946 Western's books and records and its purported returns showed the following sales receipts which *148 were attributable (1) to hardware store sales and (2) to shop receipts (i.e., furnace cleaning, repairing and installing): Reported
Gross
Receipts
Reported
Receipts
Attributable
Receipts
Per Books
to Hard-
Attributable
Year
and Records
ware Stores
to Shop
1942
$248,037.50
$ 28,611.12
$219,426.38
1943
285,289.19
131,735.68
153,553.51
1944
389,820.29
196,974.21
192,846.08
1945
489,069.54
278,705.43
210,364.11
1946
620,481.47
356,914.22
263,567.25 The sales receipts allocable to the shop business included payments for both labor and materials used. Certain receipts were entirely attributable to labor, for example, the receipts for furnace cleaning, while other receipts were attributable to both labor and sale of parts, for example, the furnace repair jobs requriing new parts. No breakdown was made by Western to distinguish between the two types of receipts. In the years 1942 through 1946 Western paid salaries and wages to various employees who were primarily engaged in furnace cleaning, repairing and installing, and to a small extent in fabricating work. On its purported returns for those years Western *149 deducted the total of these payments as a portion of the cost of goods sold. Such employees, in addition to their shop work, were also engaged in the construction of building additions during the years 1944, 1945 and 1946. The portion of the total payments attributable to this construction work is as follows: Total Salaries
Portion Attributable
Year
and Wages
to Building Additions
1942
$51,431.47
1943
42,761.30
1944
55,438.77
$ 6,900.00
1945
71,665.76
2,667.18
1946
94,873.54
20,134.40
In the years 1942 through 1946 Western purchased goods for sale in its retail hardware stores and for use in its business of repairing, cleaning and installing of furnaces. The total purchases, together with the allocation of such purchases to the retail and the shop business, are as follows: Hardware
Year
Total
Stores
Shop
1942
$142,923.07
$ 37,547.38
$105,375.69
1943
180,600.90
99,626.50 *
78,974.40
1944
252,602.67
134,475.30 **
111,069.55
1945
276,113.89
164,296.58
111,817.31
1946
386,687.39
243,966.69
142,720.70
*150 Western's inventory on January 1, 1942 aggregated $62,138.65, of which amount $1,000 represented retail hardware merchandise. On December 31, 1942, Western's inventory aggregated $74,706.99, of which amount $53,838.28 represented shop inventory and $20,868.71 represented retail hardware inventory. A physical inventory taken of retail hardware merchandise on December 31, 1946, showed an inventory at selling price of $173,401.92. Apart from this no physical inventory of furnace parts and shop items owned by Western was taken during the years 1943 through 1946. During the years 1942 through 1946 Louis S. Bahcall and Josephine S. Bahcall occupied residences owned by Western for which they did not pay rent. The fair rental value of such premises were as follows: Period
Premises Occupied
Fair Rental Value
Jan. 1, 1942 to Aug. 31, 1945
155 S. 16th Avenue
$ 75 per month
Sept. 1, 1945 to Dec. 31, 1946
601 N. 1st Avenue
300 per month
In 1946 personal expenses of Louis S. Bahcall and Josephine S. Bahcall in the amount of $6,374.85 were paid by Western and charged to Louis S. Bahcall's personal account. Josephine S. Bahcall opened a savings account *151 on October 30, 1943 with a deposit of $500 in currency. No further deposits and no withdrawals were made in 1943. In 1944 frequent deposits were made consisting principally of currency. The deposits in 1944 totaled $8,310, which deposits were in currency with the exception of check deposits totaling $930.41. On November 30, 1944 Josephine S. Bahcall withdrew $8,100 from this account. On December 1, 1944 there appeared a credit in the amount of $7,500 to her personal account on Western's books, with the notation "Bonds". A joint checking account was opened by Josephine S. Bahcall and Louis S. Bahcall on September 13, 1945, and the deposits to this account totaled $9,901.77 in 1945 and $7,649.77 in 1946. Such deposits were made up of both currency and checks. A part of the deficiency determined against Western for each of the years 1940 through 1946 was due to fraud with intent to evade tax. A part of the deficiency for the year 1940, in Docket No. 57144, was due to fraud with intent to evade tax. A part of the deficiency for each of the years 1944, 1945 and 1946, in Docket Nos. 57142 and 57143, was due to fraud with intent to evade tax. The returns filed by Western for the years *152 1940 through 1944, and for the year 1946, were false and fraudulent with intent to evade tax, and, therefore, assessment and collection are not barred by the statute of limitations. The return filed by the petitioners in Docket No. 57144, covering the year 1940, was false and fraudulent with intent to evade tax, and, therefore, assessment and collection are not barred by the statute of limitations. The returns filed by petitioners in Docket Nos. 57142 and 57143 for the years 1942 and 1943 were not false and fraudulent with intent to evade tax, and, therefore, assessment and collection are barred by the statute of limitations. Opinion The first issue is whether Western received income from sales during the years 1940 through 1946 which was not reflected on its books or reported on its purported returns for those years. It is abundantly clear from the record that the basic books and records of Western were incomplete and it is established that even some of the records turned over to the respondent by Western were unreliable. Respondent, faced with this inadequacy of the records, employed other methods to reconstruct the true income of Western during these years. Western's books *153 contained ledger accounts for both Louis S. Bahcall and Josephine S. Bahcall, who were sole stockholders of Western. There was constant activity in these accounts during the years involved with frequent credits, for the most part unexplained, and frequent withdrawals. The combined credit balances in these two accounts for the years 1941 through 1946 were $21,661.33, $64,674.71, $107,115.78, $136,571.50, $122,065.58 and $118,696.16, respectively. Some of the credits to these accounts represented salaries of Louis and Josephine which were not drawn but simply credited to the personal accounts, while other credits represented personal rental income belonging to Louis and Josephine but deposited to Western's bank account and credited to the personal accounts. These two types of credits were relatively small in amount. The bulk of the credits, as analyzed by the respondent, represented purported transactions of three principal kinds: (1) purported cash advances by the Bahcalls to Western; (2) purported payments by the Bahcalls of Western's expenses, usually by deposits to expense accounts and credits to their personal accounts; and (3) purported payments by the Bahcalls for the acquisition *154 of assets by Western, represented by debits to the asset accounts and credits to the personal accounts. Respondent determined that the credit entries, omitting the credits for salaries and for personal rents, represented unreported gross receipts of Western to the extent that these purported advances to the corporation exceeds the Bahcall's available funds in those years. However, from these total credits the respondent subtracted the cash made available to the Bahcalls through their cash drawings, which drawings were represented by debits to the personal accounts. Using this method during this period, the respondent determined that Western had unreported corporate income concealed in these personal accounts in the amounts of $11,030.89, $29,202.15, $37,505.46, $23,719.57, $2,676.98 and $9,336.75, for the years 1941 through 1946. For the year 1946 the respondent concedes on brief that his analysis of the personal account of Louis is in error to the extent of $6,513.33, and, consequently, that the unreported corporate income for that year reflected in the personal accounts should be reduced by that amount. For the year 1941, in arriving at the unreported corporate income in the amount *155 of $11,030.89, the respondent did not subtract the debits to the personal accounts of the Bahcalls, amounting to a total of $2,957.23, on the ground that the analysis revealed that such drawings merely related to the payment of personal expenses by the corporation and, therefore, were not a source of currency to the Bahcalls. Similarly, the respondent did not deduct the debits to Louis' account for the year 1945, amounting to $1,713.45, and for the year 1946, amounting to $11,374.85. We agree with the respondent that the credits, after proper adjustment, to the Bahcall's personal accounts, represent unreported income of Western. Originally the Bahcalls told the story of a cash accumulation at home, at the beginning of 1940, of more than $100,000. This story of a cash hoard was first told to the respondent's agents in 1947 at the time of the initial investigation. It was repeated with some variation in an affidavit of Louis in 1954, and finally, it was alleged in the petitions filed in these consolidated cases. At the trial, however, the story was abandoned, apparently as untrue, and the new tack is that on January 1, 1940 Louis only had a mere $4,000 or $5,000 in cash, but that he *156 personally owned a large stock of castings, such as firepots, grates, feed sections and other miscellaneous furnace repair parts, the great bulk of which he sold in the years 1940 through 1944 and that the proceeds from such sales were advanced to Western or otherwise expended by him. We have examined the record carefully and are convinced Louis did not own personally this large stock of castings and other furnace parts. In 1940, in a sworn financial statement submitted to bank receivers, Louis does not list such stock among his assets, nor does he mention such stock in any way. Various employees of Western were asked to testify on this point and their testimony is far from satisfactory. Their testimony as to the ownership of this stock is vague and inconclusive. Western's shop foreman, who has been employed either by Louis or by the corporation since 1923, testified as to the ownership of the stock that "I don't know whether it belonged to Western or who it belonged to." No attempt, as far as we can determine, was made to keep the stock separate, and it appears from evidence in the record that such stock was considered as Western's stock, for what it was worth. Also, there are indications *157 in the record that this stock was included in Western's inventories for those years, and it is also apparent that any expenses incurred in the sale of this particular stock appear as deductions claimed by Western for those years. In addition, most of the testimony seems to agree that the stock was "junk" and that it had little if any value as far back as 1936. Some of it came from bankrupt stock acquired in the 1920s. We are now asked to believe, even if we should assume that Louis did own such stock personally, that this potpourri of obsolete and neglected items going back, in some instances, to years prior to 1930, brought in receipts in excess of $100,000 during the years 1940 through 1946. We agree with the respondent that the credits, as adjusted, to the personal accounts of Josephine and Louis during this period represent unreported corporate receipts. But we do disagree with a portion of the respondent's argument as to the amount of these credits. In the years 1945 and 1946 it appears from Josephine's personal account that her withdrawals exceeded the credits to the account. In such instances the respondent merely says that withdrawals (debits) and purported advances (credits) *158 to the account cancel out and consequently there is no unreported corporate income for that particular year to be found from an analysis of Josephine's account. We cannot agree. Respondent's theory for all the years has been that the cash withdrawals (debits) for each year must be subtracted from the credits to that particular personal account for a given year, on the ground that the cash withdrawals could later have been advanced to the corporation and would appear as credits in the personal accounts. We have no dispute with that but we think it is only consistent to carry this out even in the years when the withdrawals exceed the credits. This excess can readily be determined from our findings of fact and it must be given effect in reducing the amounts which the respondent attributes to unreported corporate income in the years 1945 and 1946. We cannot agree with the respondent that Louis had no currency at all at the beginning of 1940. Louis testified that at this time he had approximately $4,000 or $5,000 in cash. We think it would be quite conceivable that he did have some cash on hand, especially in view of his business background. We hold that Louis had $4,000 on hand at the *159 beginning of 1940. Our holding, of course, provides another source of funds used by the Bahcalls for personal expenditures and effect will be given to this source by a proper reduction in the amounts attributed by the respondent to unreported corporate income for the year 1940. During the years 1940 through 1946 the Bahcalls made various expenditures, which have been stipulated both as to amount and description. Also, during this period, the Bahcalls made deposits to savings accounts and to checking accounts, which again have been stipulated. The only contention is as to the source of the funds used for these purposes, with the respondent arguing that the expenditures and deposits are further instances of unreported corporate receipts which were drained off by the Bahcalls for personal purposes and the Bahcalls again falling back on the contention that the funds came from the sales of the large stock of furnace parts and castings held in Louis' name. Our refusal to accept this story disposes of this argument made by the Bahcalls and, consequently, we agree with the respondent that the amounts stipulated, to the extent indicated in our opinion, came from unreported corporate receipts. *160 Respondent also determined that a portion of the personal living expenses of the Bahcalls during these years was paid out of unreported corporate income. The combined salaries of the Bahcalls in 1942, 1943 and 1944 were $8,000, $6,000 and $6,000, respectively, and in those same years the total amounts credited, as salaries, to the personal accounts of the Bahcalls on Western's books were $7,966.70, $5,182.90 and $5,066.40. Respondent contends that this left only $33.30, $817.10 and $933.60 in salaries actually paid to the Bahcalls in the respective years which could be used for their living expenses and that the excess of their living expenses over those amounts must necessarily have come from unreported corporate receipts. This excess for each year was computed by the respondent on the basis of estimated annual living expenses of $8,000. The Bahcalls again rely principally on their contention that the source of the funds for their living expenses came from the sale of Louis' personal assets. We have rejected this story and consequently must agree with the respondent on this point. However, a study of the record persuades us that the respondent's estimate of annual living expenses *161 of $8,000 is too high and we hold that such living expenses for the years in question were $4,000 annually. When the respondent's agents examined Western's books and records they found credit balances in a number of individual accounts receivable ledger accounts. Some of these credit balances had existed for several years. The total credits to such accounts in the years 1941 through 1946 which still existed at the time of the investigation were small in amount, ranging from approximately $160 in 1941 to approximately $1,500 in 1946. Respondent argues that "such credit balances represented sales which had never been recorded as such on Western's records, i.e., that the credits to the accounts receivable properly recorded the customers' payments for work performed but that the antecedent entries crediting sales and crediting debit balances in the customers' accounts had never been made." Based on this argument the respondent included in Western's gross income the total credit blances in the years in which such credit balances were created. We think this analysis of the respondent's is unjustified and cannot be supported. Western was on an accrual basis with its use of inventories and *162 the sales were properly includible in its income when made, not when the customers made payment. We think that the respondent's approach would distort Western's annual sales. The existence of the credit balances permits of too many explanations to warrant our accepting the one proffered by the respondent. We hold that such credit balances in the accounts receivable ledger do not represent additional income for Western in the years 1941 through 1946. The next issue is whether Western, by arbitrarily understating its inventories in each of the years 1943 through 1946, understated its gross income from sales in those years. In its purported return for 1946, Western showed a closing inventory as of December 31, in the amount of $67,027.97. Respondent increased Western's inventory as of that date by the amount of $166,191.27. By working backward from 1946 to December 31, 1942, as later explained, respondent made adjustments in the ending inventories for each of said years which resulted in understatements of Western's gross income in the years 1943 to 1946 in the amounts of $8,486, $29,145.18, $78,507.47 and $50,052.60. Respondent was compelled to reconstruct the inventories for the *163 years here involved. The figures used by Western were obviously wrong, being at best no more than arbitrary estimates. Also, Western's books and records were unreliable and far from complete, so that the respondent, in computing the inventories, had first to reconstruct some of the elements going into the computation, such as the yearly sales and purchases figures. Respondent's agents were able to use certain inventory sheets used by Western in taking its hardware store inventory for the end of 1946. These were the only records pertaining to inventory which were available. No part of this inventory taken by Western was connected with the shop end of Western's business, and, in fact, Western's counsel conceded that no inventory was even taken of the shop items. In reconstructing the inventories the respondent adopted the December 31, 1946 inventory of the hardware stores as shown by the inventory sheets, adopted purchases as shown on Western's books, with adjustments to eliminate improper charges relating to capital improvements, adopted sales as shown by the books with adjustments for substantial unrecorded sales, adopted shop labor as shown on the returns, with adjustments to eliminate *164 the labor used in making capital improvements, and also adopted the beginning and ending inventories shown on Western's purported return for 1942. Respondent also allocated the sales and purchases figures between the shop and the hardware store activities of Western. We accept the inventory of hardware items, as of December 31, 1946 as correct, since it was based upon the actual inventory sheets used by Western. But we have made a finding of fact that Western had a small inventory at the beginning of 1942 and, therefore, the respondent's use of a zero hardware inventory as of that date is incorrect. To reconstruct the hardware store inventories at cost as of December 31, 1942, 1943, 1944, 1945 and 1946 the respondent first computed the total hardware sales for the entire period, in the amount of $992,940.66, to which he added the closing hardware inventory of $173,401.92, resulting in a total sales value of goods available over the entire period in the amount of $1,166,342.58. The total hardware purchases for the period were computed by the respondent in the amount of $679,912.45, which, subtracted from the total of $1,166,342.58, left an aggregate gross profit for the entire period *165 of $486,430.13. Using these figures the respondent computed the following percentage ratios: cost
$ 679,912.45
58.2944 %
sales
$1,166,342.58
gross profits
$ 486,430.13
41.7056 %
sales
$1,166,342.58
mark-on
$ 486,430.13
71.54305%
cost
$ 679,912.45 These ratios were then applied to hardware purchases and sales in each of the years in the following manner: to the sum of opening inventory and purchases was added the mark-on of 71.54305 per cent, which resulted in the total sales value of goods available for sale in that year; the actual hardware sales for that year when then subtracted, leaving as the remainder the closing inventory at selling price; from this was subtracted the gross profit factor of 41.7056 per cent, which resulted in the closing inventory figure for that year at cost. By this method the respondent determined the hardware store inventories as follows: Year Ending
Hardware Inventory
Dec. 31
at Cost
1942
$ 20,868.71
1943
43,700.68
1944
63,351.04
1945
65,177.94
1946
101,083.61
As for the shop inventory, it was entirely omitted by Western from its records and from its purported *166 tax return for 1946. Louis S. Bahcall stated that no physical inventory was ever taken of shop material. Respondent, consequently, was forced to reconstruct this figure as well as the hardware inventory. To compute the shop inventories for the years subsequent to 1942, the respondent computed the gross profit on shop activities as to 1942 and projected it uniformly to succeeding years. He accepted the January 1, 1942 inventory shown on Western's purported return as correct and we agree with this except for the $1,000 adjustment with respect to the hardware inventory we previously mentioned. Respondent also accepted the December 31, 1942 inventory of $74,706.99 as shown on Western's purported return but, as indicated above, this amount included hardware inventory in the amount of $20,868.71, leaving shop inventory of $53,838.28. Cost of goods sold for 1942, with respect to the shop, was computed by finding the total of the opening inventory of $62,138.65, the purchases allocated to shop in the amount of $105,375.69, and shop labor of $51,431.47. Closing inventory in the amount of $53,838.28 was subtracted for a total cost of goods sold for 1942 of $165,107.53. Since the total sales *167 allocated to the shop in 1942 aggregated $257,091.91, the gross profit as computed for 1942 was $91,984.38. Using these figures the respondent computed the following ratios: gross profit
$ 91,984.38
35.7788%
sales
$257,091.91
mark-on
$ 91,984.38
55.7118%
cost
$165,107.53 Shop inventories were then computed for the subsequent years as follows: Opening inventory, shop purchases, and shop labor were totaled, and to that total was added the mark-on percentage of 55.7118%, which resulted in the total selling price of goods and labor available for sale in that year; from this total was subtracted the shop sales for the year, leaving as a remainder the closing inventory at selling price; this was reduced to cost by subtracting the gross profit factor of 35.7788%. In this way the respondent determined the following shop inventories: [3]
Year Ending
Shop Inventory
Dec. 31
at Cost
1942
$ 53,838.28
1943
47,735.37
1944
57,951.88
1945
95,474.53
1946
132,135.61
*168 After the respondent reconstructed the shop and hardware inventories for the years 1942 through 1946 he compared them with the incorrect inventories which appeared on Western's purported returns and determined, through such comparison, that Western had understated its gross income as follows: 1942
1943
1944
1945
1946
Store Inventory, December 31
$20,868.71
$43,700.68
$ 63,351.04
$ 65,177.94
$101,083.61
Shop Inventory, December 31
53,838.28
47,735.37
57,951.88
95,474.53
132,135.61
Total Inventory, December 31
$74,706.99
$91,436.05
$121,302.92
$160,652.47
$233,219.22
Inventory per Return, December 31
74,706.99
82,950.05
83,671.74
44,513.82
67,027.97
Understatement of Ending Inventory
$ 0.00
$ 8,486.00
$ 37,631.18
$116,138.65
$166,191.25
Less: Understatement of Beginning Inven-
tory
0.00
8,486.00
37,631.18
116,138.65
Understatement of Gross Income
$ 8,486.00
$ 29,145.18
$ 78,507.47
$ 50,052.60
We think that the respondent was entirely justified in using this method of reconstructing the shop inventories and we hold that his determination of understated gross income for these years *169 through the use of such method is substantially correct with the adjustments which must necessarily be made in the actual computation because of our holdings elsewhere in the opinion. It is conceded by Western's own expert witness that the method used by the respondent is sound in theory. Western objects to certain assumptions and allocations made by the respondent in reconstructing the inventories. It is unnecessary to go into these objections in any detail, since, in essence, they demand a precision and accuracy in reconstructing Western's inventories for these years which is simply impossible, with the books and records and other available information being in such unsatisfactory condition. Western objects to the inclusion of all labor costs by the respondent in his reconstruction of the shop inventory. The labor included in the computation consisted primarily of salaries and wages paid to Western's employees engaged in cleaning, repairing and installing furnaces, and only in part of wages paid to employees engaged in actual fabrication or manufacture. However, Western's invoices, throughout this period, made no satisfactory distinction between charges for labor and charges for *170 parts. Nor do Western's books and records make such a distinction. Consequently, in computing a gross profit percentage, it is obvious that the cost of the labor element must be included as part of the annual cost of total sales. It would be meaningless, in a reconstruction of Western's inventories, to use a total sales figure which included the receipts attributable to labor and then to exclude from the cost of sales figure the cost of such labor. Moreover, if we were in some way able to eliminate the labor factor from total sales, then it would be equally necessary to remove such factor from the cost of sales, and consequently the resulting percentage ratios which play a large role in the reconstruction, would remain approximately the same. Western also objects to the respondent's allocation of total sales and purchases to shop activities and to hardware store activities. This objection has no merit. The allocation was based upon Western's own sales and purchase journals, which formed some basis for the respondent's allocation. Also, in making the allocations, the respondent was assisted by Western's bookkeeper. Western introduced in evidence a computation purporting to be a more *171 accurate reconstruction of the inventories for this period. It is interesting to note that Western itself makes an allocation of total sales and purchases between shop and hardware activities. The reconstruction is replete with guesses and arbitrary estimates, usually originating with Louis S. Bahcall. It is based to a substantial degree upon certain figures and assumptions which are without any support in the record. We have examined the entire computation carefully and find it to be completely unreliable. Respondent determined that Western made capital expenditures in the years 1940, 1944, 1945 and 1946 and improperly claimed deductions for such amounts in those years as ordinary expenses and as a part of its cost of goods sold. Western apparently concedes that it charged these capital expenditures to ordinary expense accounts and to miscellaneous purchase accounts but it disputes the amounts involved. As to the year 1940 we have made findings of fact as to the nature of the building constructed by Western and have also found that the building was constructed in 1940 and we agree with respondent that the amount expended in construction was improperly claimed by Western as an ordinary *172 expense in that year. Western claims that the building was constructed in 1939 and that the greater portion of the expenditures connected with such building were charged off in 1939, not in 1940. Even if we should find, as we do not, that this building was put up in 1939, there is nothing in the record to show that any of the expenditures were charged off, or capitalized, in 1939 rather than in 1940. Respondent determined that the entire cost of construction was claimed by Western in 1940 and we cannot say that Western has carried its burden of proof in showing that respondent's determination was wrong. Since these capital expenditures were buried among the ordinary expenditures and miscellaneous cash purchases made by Western in those years, the respondent, rather than undertake the impossible task of hunting out the specific item, adopted another approach. He sought to establish, through an expert witness, what the cost of construction would be of such buildings, then determine, with some exceptions, that the entire cost was improperly charged to ordinary expense accounts and to cash purchase accounts. We think that respondent's method, under these circumstances, is acceptable. It *173 was developed at the trial that the building materials used throughout these years were obtained at discounts; that some of the materials were not new and that the labor on such buildings was done, to a substantial degree, by Western's employees. Respondent's expert witness, keeping these factors in mind, estimated that the cost of construction was $.17 per cubic foot. We agree with this estimate. In 1944 Western constructed an addition to existing buildings. Construction was identical to the capital improvements made by Western in 1940. It was stipulated that a "large part of the cost of materials used for the construction was reflected in the corporate books and on the Form 1120 filed by the corporate petitioner for 1944 as miscellaneous cash purchases and shop expense, and these amounts were included in cost of goods sold and shop expense for 1944." Respondent, using the testimony of the same expert witness who testified that the cost of construction was $.17 per cubic foot, argues on brief that Western charged off in 1944 the amount of $10,557.51 (62,103 cubic feet X $.17) as ordinary expenses, which should have been capitalized. A witness for Western testified that he had examined *174 Western's books for 1944 and was only able to locate the amount of $7,419.80 charged to shop expense and to miscellaneous cash purchases which should have been capitalized. Western, therefore, contends that it is only this amount which should be disallowed as an ordinary expenditure for that year. However, it appeared on cross examination that the witness was unable to discover from Western's books what labor from Western's regular payroll was used in the construction of these buildings. Nor was he able to state with any conviction that all cash amounts paid to subcontractors or for materials were uncovered by him. Consequently, we cannot accept this amount as the whole extent of the capital expenditures which were charged to other accounts in 1944. We agree with the respondent that the cost of constructing this addition, based upon a construction cost of $.17 per cubic foot, was improperly charged to shop expense and cash purchases and otherwise improperly claimed by Western as a deduction in 1944. There is no dispute about the year 1945. It was stipulated that Western made capital improvements in that year at a cost of $5,334.36, which amount was included by Western in "'other *175 deductions' of $38,682.08 claimed as a deduction on line 29(c) of [Western's] Form 1120 as filed for the year 1945." In 1946 an addition was constructed to the existing buildings on premises owned by Western, and again the construction was identical to the additions in 1940 and 1944, except that the 1946 addition was not heated. The cost of constructing this 1946 addition was $.17 per cubic foot, which finding we base on the same expert testimony as in the prior additions. Also in 1946 certain additions and improvements were made on other property owned by Western. The nature of these latter improvements has been stipulated and in our findings of fact we have found they amount to $9,519. It has been stipulated that a "large part of the cost of materials used for construction were reflected in the corporate books and on its Form 1120 filed for 1946 as miscellaneous cash purchases and shop expenses and these amounts were included in cost of goods sold and shop expense for 1946." In that same year Western also made improvements of a capital nature amounting to $2,268.80 and it was stipulated that this entire amount was included in "other deductions" of $55,917.58 which were claimed *176 as a deduction by Western on its purported return filed for 1946. Respondent determined that the building addition, at a cost of $.17 per cubic foot, the improvements totaling $9,519 and the improvements totaling $2,268.80 were all improperly included in Western's deductions and cost of goods sold for 1946 and, therefore, disallowed the entire amount. [4] Western's witness testified that he examined the books and records for 1946 and was only able to discover improper charges of $13,398.51 buried in the "shop expense" account. We cannot accept Western's contention that this is the only amount which was improperly charged to shop expense and to miscellaneous cash purchases for 1946. It appears that the witness, according to his own testimony, did not pick out the labor elements that went into the capital construction nor was he sure that he found all the materials from inventory that went into the construction but which were buried among the cash purchases. We think that, after a careful consideration of the nature of the construction and the pertinent evidence, the respondent's contentions that a total of $26,051 in construction costs was improperly charged to current expenses in 1946 *177 must be upheld. Respondent made certain adjustments to Western's reported capital gains in the years 1942, 1945 and 1946. For 1942 it was stipulated that Western realized a net long-term capital gain of $5,856.54 upon the sale of two parcels of real estate. Western reported no capital gain on its purported return for 1942, and, consequently, respondent's determination of a 1942 net long-term capital gain in the amount of $5,856.54 is correct. In 1945 Western reported a net short-term capital gain of $623.85 and a net long-term capital gain of $7,745.37. It has been stipulated that the correct net long-term gain was $6,551.99 and the correct net short-term capital gain was $698.79. Consequently, respondent's determination that the reported net long-term gain was overstated in the amount of $1,193.38 and *178 that the net short-term capital gain was understated by $74.94 is correct. In 1946 Western reported a net short-term capital loss of $450, a net long-term capital gain of $3,825 and an excess of net long-term capital gain over net short-term capital loss of $3,375. It has been stipulated that Western realized no capital losses in 1946, that total net long-term capital gain was $4,074.87 and that short-term capital gains were realized from the sale of properties known as 910 Washington Boulevard and 122 South 11th Avenue. As to the former, the parties stipulated that the short-term capital gain was $3,582.37. As to the latter, it was stipulated that the property was purchased on July 31, 1946 for $5,000 and sold on contract on the same day for $6,100. Respondent determined that Western realized a total net short-term capital gain in 1946 of $4,682.37. With respect to the sale of the 122 South 11th Avenue property, Western contends that "the profit of $1,100.00 should be charged to the corporation on the installment basis and not all in one year, as the record indicates the property was sold on the basis of $75.00 per month which would make it impossible for petitioner to have received *179 30% of the selling price in the first year, therefore entitling the petitioner to report the gain on the installment basis." There is no evidence to show that Western elected to report the sale on the installment basis, nor, in fact, that Western reported the gain at all. The respondent is sustained. We recognize that the burden of proof to prove increased deficiencies is on the respondent. But there is no need to again allude to the claims made by the respondent in an amended answer for increased deficiencies and additions to tax, since in each of the years for which the respondent has made such claims, we have held above that the deficiencies and additions to tax were not greater than those originally determined. The correctness of the additions to tax under section 291(a) claimed for the first time in this Docket No. 57117 by the respondent's answer rests upon stipulated facts as to signatures on the returns and questions of law. From January 1, 1942 to August 31, 1945, Josephine and Louis lived in premises owned by their corporation, Western, and from September 1, 1945 through December 31, 1946 they lived in other premises also owned by Western. It is stipulated that the respective *180 rental values of these premises were $75 and $300 per month. The Bahcalls paid no rent to Western during these periods. It is clear that the benefit received by them through the free occupancy of the corporate premises constitutes additional compensation includible in their taxable income for those years. Percy M. Chandler, 41 B.T.A. 165, affirmed 119 Fed. (2d) 623. Respondent determined that they are each taxable on one-half of the fair rental value of the premises occupied. We agree with this determination so far as it concerns the years which are still open. In 1940 Louis and Josephine Bahcall owned certain premises as joint tenants and in that year Western made expenditures for constructing a building addition on such premises. These expenditures made by Western for the personal benefit of its stockholders are clearly to be regarded as corporate distributions taxable as dividends. Louis Greenspon, 23 T.C. 138, modified 229 Fed. (2d) 947. We sustain the respondent on this issue. Respondent also determined that Josephine and Louis received undeclared or constructive dividends from Western during the years 1943 through 1946 *181 in the respective amounts of $927.38, $10,310, $27,144.02 and $16,455.94. [5] These alleged dividend distributions consisted of unreported current corporate receipts appropriated by the Bahcalls and used by them for living expenses and for deposit to personal bank accounts and certain amounts withdrawn by them from Western in the years 1945 and 1946. This latter category of withdrawals in the years 1945 and 1946 requires some comment. During all the years here involved the petitioners, Josephine and Louis, had a personal account on Western's books and in each year there appeared a series of credits and debits. The debits represented withdrawals. In the years 1945 and 1946 the withdrawals from these personal accounts exceeded the credits. It is this excess which the respondent has included in the income of the Bahcalls, as constructive or undeclared dividends, for the years 1945 and 1946. Respondent allocated the total distributions to the Bahcalls on the basis of their respective shares of stock ownership to Western. Petitioners Josephine and Louis, in their argument on this issue, again repeated their contention that Louis personally owned a substantial stock of furnace parts and *182 castings and that all the amounts which respondent attributes to their income under this issue were really receipts from the sale of this personal stock in these years. We have already rejected this argument, and, consequently, we sustain the respondent as to the years which are still open. We hold that the amounts determined by the respondent are correct with the adjustments in such amounts which are necessitated by our findings elsewhere in the opinion. Respondent claimed increased deficiencies in Docket Nos. 57142 (Josephine) and 57143 (Louis) for the years 1943 and 1944 by amended answer, and, of course, respondent has the burden of proof in proving such increases. The year 1943 in both dockets, as we have found in our findings of fact, is barred by the statute of limitations, and, consequently, we need no longer discuss it. For the year 1944 the increase in income tax deficiencies claimed by respondent in Docket Nos. 57142 and 57143 were $2,833.51 and $21, respectively. In paragraph 6C of the amended answer in Docket No. 57142 *183 the respondent alleges that Josephine received unreported income from Western of $10,205.86, while in his notice of deficiency he alleged that this amount was $2,474.75. A similar increase of unreported income, although of a much smaller amount, was alleged by the respondent in his amended answer in Docket No. 57143. It is these increases which cause the claims for increased deficiencies in 1944. We have studied the evidence carefully and we believe that the respondent has carried his burden of proof as to any increased deficiencies which might result after giving due consideration to our other findings in this opinion. We have made an analysis of the amounts involved in connection with Western's liability and it would serve no useful purpose to repeat such analysis here. These amounts of unreported income, as we have indicated elsewhere in this opinion, came mainly from corporate sales used by the Bahcalls for living expenses and for deposits to personal accounts and to actual withdrawals from Western through the conduit of the personal accounts on Western's books. The only explanation offered by the Bahcalls was first the cash hoard story, which was abandoned, and then the story *184 of the vast amounts of stock owned personally by Louis and which had been accumulated since the 1930s. We have placed no credence in this story. In fact, the evidence presented tends to discredit such an explanation. Respondent determined that Western was liable for additions to tax under section 293(b) for the years 1940 through 1946. The burden of proof to show fraud is on the respondent and it must be established by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751. The conclusion as to whether or not fraud exists must be reached not on isolated bits of testimony but on the whole record. William W. Kellett, 5 T.C. 608. Here we have a consistent understatement of corporate sales both through the device of understating inventories and through the use of personal accounts. There is evidence to show that Louis Bahcall, in several instances, had actual inventory data available and that such data was deliberately ignored in arriving at the inventory figures which were used on Western's purported returns for these years. With respect to these inventory figures there was a marked lack of cooperation on the part of Louis Bahcall in supplying what *185 little inventory data was available, and, in fact, there were actually efforts to mislead the respondent in his efforts to reconstruct such inventories. There is also evidence that some of the charges on the invoices on jobs done by Western's employees in repairing and servicing furnaces were not fully recorded on Western's books. Very pertinent is the fact that corporate sales throughout these years were deliberately omitted from the reported gross receipts, and, instead, were funnelled through the personal accounts on Western's books as advances by the Bahcalls to the corporation. Throughout the entire investigation Western concealed from the respondent a fairly complete file of corporate sales which extended back over a period of years. Also, in some of the years involved Western made a series of capital improvements in substantial amounts and charged such expenditures to shop expenses or otherwise buried such items in miscellaneous cash purchases which were ultimately deducted as part of the yearly cost of goods sold. Western's bookkeeper, who made these improper entries, testified that he was aware of the capital nature of the expenditures but was ordered to make them by Louis *186 Bahcall. There is evident in all of this, a pattern of deliberate concealment or understatement of corporate income throughout these years. We have examined the whole record and are convinced that a part of the deficiency for each of the years 1940 through 1946 was due to fraud with intent to evade tax. Our holding on this issue is also determinative of Western's contention that some of the years here involved are barred by the statute of limitations. Section 276(a). Western did not file excess profits tax returns for any of the years 1940 through 1945 and, consequently, for such returns the statute of limitations argument is not applicable. Section 276(a). Respondent determined that petitioners Josephine S. Bahcall and Louis S. Bahcall are liable for additions to tax under section 293(b) for the years 1940 and 1942 through 1946. Respondent has the burden of proof to establish fraud for each of the years involved by clear and convincing evidence. We feel we can eliminate the years 1942 and 1943 for the deficiencies determined for those years are based primarily on the failure of Josephine and Louis Bahcall to include in their income the fair rental value of the premises owned by *187 the company and occupied by them. We do not feel that evidence of omissions of this type, standing alone, will support a finding of fraud. Our holding on the fraud issue with respect to these two years means that they are barred by the statute of limitations. Section 276(a). With respect to the other years involved, we have examined the record carefully and we believe that the respondent has carried his burden of establishing fraud by clear and convincing evidence. Arlette Coat Co., supra.Many of the manifestations of fraud displayed by the Bahcalls in connection with their corporation are applicable with equal force here. The petitioners' rather flagrant conduct of the operation of Western Supply not only concealed the income of the corporation but, also, at the same time, channeled income to the petitioners which they did not report in their returns for said years. In 1940 the petitioners erected a building on jointly owned property and the costs of construction were paid by their corporation and charged on its books to ordinary expense accounts. There were deposits of substantial amounts in their bank accounts during the years 1944 through 1946 and when questioned *188 as to the source of these funds, petitioners claimed they were from a cash hoard, a story now discarded by them. In some of the years the withdrawals by the petitioners from Western Supply were greatly in excess of the purported advances by them to the corporation. These excess amounts, which clearly went to the petitioners, were not reported by them on their returns for those years. Petitioners were both engaged in the daily operation of the business and we are convinced that they were keenly aware of these amounts of unreported income in the years before us. We hold, on the basis of the entire record, that a portion of the deficiencies for the years 1940 and 1944 through 1946 was due to fraud with intent to evade tax. Our holding on this issue disposes of the statute of limitations issue raised by the petitioners as to the year 1940. Section 276(a). Respondent determined that Western was liable for additions to tax under section 291(a) for the years 1942 through 1946 for failure to file proper corporate returns and for the years 1940 through 1945 for failure to file excess profits tax returns. Section 291(a) imposes the addition to tax for failure to file a return "unless it is *189 shown that such failure is due to reasonable cause and not due to willful neglect." Western's purported corporate income tax returns for the years 1942 through 1945 were signed only by Josephine S. Bahcall, president, while the purported return for 1946 was signed only by Louis S. Bahcall, treasurer. Western did not file any excess profits tax returns for the years 1940 through 1945. Section 52(a) provides that every corporate return "shall be sworn to by the president, vice president, or other principal officer and by the treasurer, assistant treasurer, or chief accounting officer." In Burford Oil Co., 4 T.C. 613, affirmed 153 Fed. (2d) 745, where the corporate return was signed only by one officer, we upheld the additions under section 291(a), indicating that the requirements of section 52(a) were mandatory. In Consolidated Apparel Co., 17 T.C. 1570, reversed in part on other issues, 207 Fed. (2d) 580, the section 291(a) addition to tax was not imposed where the corporate return was signed only by the president. However, we indicated in that case that the signer there "was in fact both president and treasurer." *190 Lucas v. Pilliod Lumber Co., 281 U.S. 245; Ethel D. Co., 27 B.T.A. 25, and J. F. Anderson Lumber Co., 15 B.T.A. 475, are to the same effect. These cases are not applicable here for we have not been shown to our satisfaction that Josephine, as president, performed the duties of treasurer as well as those of president, nor have we been shown that Louis, as treasurer, performed the duties of president as well. See Fourth & Railroad Realty Co., 25 T.C. 458. Western had a full complement of officers and, in fact, its corporate returns for the years 1940 and 1941 were signed by both corporate officers. We do not regard the signature of Harry Gartner, the corporation bookkeeper, on the returns in his capacity as notary, as supplying the missing signature of a corporate officer. Western argues that it relied on the advice of its bookkeeper in submitting the returns with only one signature and that such reliance constitutes reasonable cause. It is true that reliance upon the advice of counsel or of expert accountants sought and received in good faith is reasonable cause for failure to file a tax return. *191 East Coast Equipment Co., 21 T.C. 112, affirmed 222 Fed. (2d) 676. See also Wm. J. Lemp Brewing Co., 18 T.C. 586; Reliance Factoring Corporation, 15 T.C. 604. However, we are not at all persuaded in this case that the bookkeeper had any special knowledge or training in tax law or that he was otherwise competent in tax matters. In fact, he testified that he did not know that corporate returns had to be signed by two officers. See Mayflower Investment Co., 24 T.C. 729, 733. Nor is it established in the record that Western relied upon the advice of the bookkeeper. We hold that Western's failure to file proper corporate returns for the years 1942 through 1946 was due to wilful neglect and not to reasonable cause. Western did not file excess profits tax returns for the years 1940 through 1945. No showing has been made by Western that such failure to file these returns was due to reasonable cause and not due to wilful neglect. We have not been presented with any satisfactory proof that Western believed in good faith and on reasonable grounds that it had no excess profits tax net income in the years involved. *192 See P. Dougherty Co., 5 T.C. 791, affirmed 159 Fed. (2d) 269. Any belief that the returns were not necessary is not sufficient to discharge the addition to tax under section 291(a). Burford Oil Co., supra.We hold that Western's failure to file excess profits tax returns for these years was due to wilful neglect and not due to reasonable cause. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: JOSEPHINE S. BAHCALL, Docket No. 57142; LOUIS S. BAHCALL, Docket No. 57143 and LOUIS S. BAHCALL and JOSEPHINE S. BAHCALL, his wife, Docket No. 57144.↩
2. All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.↩
*. Excludes $2,000 improperly charged to hardware purchases. ↩
**. Excludes $7,057.82 improperly charged to hardware purchases.↩
3. Respondent, in an amended answer, made certain adjustment to the figures in his original determination, which merely shifted inventory figures from one year to another without disturbing the overall determination for the years here involved.↩
4. Respondent made certain concessions on brief as to the amounts originally determined by him. Also, the respondent conceded that the amount of $9,972 was not charged on Western's books until after the close of 1946 and, therefore, should not be included in the adjustments made to Western's income for 1946. Effect will be given to these concessions in the Rule 50 computation.↩
5. Respondent concedes that the amounts determined by him in paragraph 6C of Amendments to Answer in Docket Nos. 57142 and 57143 are incorrect.↩